**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARVELLA SOAD QUIROZ-LARA,<br><br>Petitioner,<br><br>v.<br><br>TODD BLANCHE, ET AL.,<br><br>Respondents. | Case No. 5:26-cv-03917-AJR<br><br>**MEMORANDUM DECISION AND ORDER GRANTING PETITION AND ORDERING IMMEDIATE RELEASE** |

**I.**

**INTRODUCTION**

On July 14, 2026, Petitioner Marvella Soad Quiroz-Lara (A# 213-530-970) ("Petitioner"), an immigration detainee represented by counsel, filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (the "Petition"), challenging her detention at the Adelanto ICE Processing Center. (Dkt. 1 at 6-7.) On July 22, 2026, Respondents Todd Blanche, Acting Attorney General, Todd Lyons, Acting Director of Immigration and Customs Enforcement ("ICE"), Andrew Quinones, Los Angeles Field Office Director of ICE, Warden of the Adelanto Detention Center, Markwayne Mullin, Secretary of the Department of Homeland Security ("DHS"), DHS, the Executive Office of Immigration Review ("EOIR"), and ICE (collectively,

"Respondents") filed an Answer to the Petition.  (Dkt. 8.)  The Answer states that "Respondents are not presenting an opposition argument at this time."  (Id. at 2.)  Accordingly, Respondents have expressly consented to the relief sought by Petitioner.  See C.D. Cal. L.R. 7-12.  On July 23, 2026, Petitioner filed a Declaration in Support of the Petition ("Petitioner's Declaration").  (Dkt. 9.)  On July 24, 2026, Petitioner filed a Traverse in Support of the Petition (the "Traverse").  (Dkt. 10.)  The parties have consented to proceed before the undersigned U.S. Magistrate Judge for all purposes.  (Dkts. 3, 6.)  **For the reasons set forth below, the Court GRANTS the Petition and orders Respondents to immediately release Petitioner from custody on Petitioner's prior conditions of release.**

## II.

### FACTUAL BACKGROUND

The following facts are taken from the Petition, which is verified by counsel.  (Dkt. 1 at 33.)  Respondents had the opportunity to dispute these facts or provide contrary facts, but declined to do so.  (Dkt. 8.)  Indeed, "Respondents are not presenting an opposition argument at this time."  (Id. at 2.)  Therefore, the Court considers the following facts to be undisputed and conceded for purposes of ruling on the Petition.  See C.D. Cal. L.R. 7-12; Carlson v. Landon, 186 F.2d 183, 188 (9th Cir. 1950) (explaining that courts must assume undisputed facts alleged in a habeas petition are true).

Petitioner is a 29-year-old woman who most recently arrived in the United States from Honduras in April of 2019.  (Dkt. 1 at 10.)  Petitioner left Honduras to seek safety in the United States after she was threatened by persons responsible for her parents' murders and to seek economic opportunities to support her 12-year-old daughter.  (Id.)  When Petitioner arrived at the border near Laredo, Texas, she was immediately arrested by immigration officers and detained for approximately 16 months.  (Id.)  In that time, she was never provided with a credible or reasonable

2

fear interview to assess eligibility for protection under asylum laws.  (Id.)  At least once, Respondents flew Petitioner to Honduras, attempting to remove her.  (Id.)  Honduras refused to accept Petitioner because her birth had not been registered with the Honduran national registry.  (Id.)

While detained, despite receiving no direction from the Government on how to cooperate, Petitioner took the initiative on her own behalf to obtain the required documents that Respondents needed to facilitate her deportation.  (Id. at 10-11.)  Petitioner was in communication with the ICE official assigned to her case during this time.  (Id. at 11.)  Petitioner worked with her aunt and an attorney in Honduras to register her birth and to assist her in gathering other identity documents.  (Id.)  Petitioner submitted her baptismal certificate, vaccine record, and her parents' death certificates to the Honduran government to facilitate her return.  (Id.)  Still, the Honduran government refused to issue travel documents and Petitioner remained detained in Laredo, Texas.  (Id.)

Respondents attempted to deport Petitioner approximately 11 times as she was transferred from the detention facility to a deportation bus and flight.  (Id.)  After their unsuccessful attempts, ICE released Petitioner under an Order of Supervision ("OSUP") on August 13, 2020.  (Id.)  The OSUP identifies Petitioner's final order of removal as being issued on December 3, 2019.  (Id.)  After Petitioner's release from ICE custody in 2020, Petitioner moved to California.  (Id.)  Petitioner was directed to check in with ICE at the Camarillo office, which she did ten times between 2020 and 2026.  (Id.)  While attending these check-ins, Petitioner continued to make efforts to obtain the documents that ICE officials requested, including by visiting the Honduran consulate in Los Angeles.  (Id. at 11-12.)  The officers did not provide any instruction on the documents they required or how to otherwise facilitate Petitioner's removal.  (Id. at 12.)  The Honduran consulate advised Petitioner that no information regarding her nationality was found in their records.  (Id.)  Petitioner tried twice more over subsequent years, each time with the same

result.  (Id.)

On January 29, 2026, Petitioner can in for one of her check-ins and was told by an ICE officer that the law had changed and her case had closed.  (Id.)  Petitioner was then immediately detained by ICE and was not provided any reason for her detention or an opportunity to speak with an officer.  (Id.)  Since Petitioner's re-detention on January 29, 2026, the Government has tried to effectuate her deportation several more times.  (Id.)  Petitioner was once again flown to Honduras, but refused entry upon arrival.  (Id.)  Petitioner was transported to airports in Phoenix, Denver, and Texas, but was ultimately returned to the Adelanto ICE Processing Center, after Respondents were unable to secure her removal.  (Id.)

In March 2026, Petitioner was given a form by an ICE officer that documented her consent to be deported to Mexico and was ordered to sign it and provide her fingerprint.  (Id. at 13-14.)  Petitioner refused, telling the officer she had no connection to Mexico and did not know anyone there.  (Id. at 14.)  The officer did not tell her whether Mexico would accept her, even though she did not have the required travel documents for Honduras.  (Id.)  Within a few days, Petitioner was interviewed by immigration officials about her fear or being deported to Mexico.  (Id.)  Respondents informed her that she did not pass her interview and would be deported.  (Id.)

A few days later, Petitioner was taken into a small office and met by two officers who once again presented the document and told Petitioner that her consent could be obtained "the easy way or the hard way."  (Id.)  One of the officers covered the text of the document with her arm so as to prevent Petitioner from reading it.  (Id.)  The document was in English, a language Petitioner cannot read.  (Id.)  The officer told Petitioner the form was only to document her consent to be transferred to Texas.  (Id.)  Eventually, Petitioner felt she had to sign the document so she could be released and deported to Mexico.  (Id.)

ICE attempted to deport Petitioner that same day she signed the document and

was first transferred to Texas.  (Id.)  While in Texas for removal to Mexico, an ICE officer reviewed Petitioner's file and asked Petitioner if she had any ties to Mexico, noting that she was from Honduras.  (Id.)  Petitioner told the officer that she did not, so the officer told her she would not be deported to Mexico, but instead returned to the Adelanto ICE Processing Center.  (Id.)

## III.

## PETITIONER'S CLAIMS

Petitioner's first claim for relief is that her continued detention violates her substantive due process rights as recognized by Zadvydas v. Davis, 533 U.S. 678, 690 (2001).  (Dkt. 1 at 16-17.)  Petitioner's second claim for relief is that her detention violates her procedural due process rights, as well as 8 U.S.C. § 1231 and 8 C.F.R. § 241.13.  (Id. at 18-23.)  Petitioner's third claim for relief is that Respondents' revocation of her OSUP violated her procedural due process rights and 8 C.F.R. § 241.13.  (Id. at 23-25.)  Petitioner's fourth claim for relief is that efforts to remove Petitioner to a third country violate her due process rights under the Fifth Amendment, as well as 8 U.S.C. § 1231.  (Id. at 25-29.)

Petitioner seeks immediate release from custody and reinstatement of her prior OSUP with the same conditions in place at the time of her re-detention, as well as the return of all property confiscated from her during her arrest and processing into detention.  (Id. at 30.)  Petitioner further seeks an order enjoining Respondents from re-detaining Petitioner unless and until Respondents obtain a travel document for her removal and without a pre-deprivation hearing.  (Id.)  Petitioner further seeks an order enjoining Respondents from re-detaining Petitioner without first following all procedures set forth in 8 C.F.R. §§ 241.4, 241.13, and any other applicable statutory and regulatory procedure.  (Id.)  Petitioner further seeks an order enjoining Respondents from removing Petitioner to a third country unless Respondents provide 10 days' notice to raise a fear-based claim for protection prior to removal

and if Petitioner does assert a fear-based claim, Respondents must move to reopen proceedings to provide Petitioner a meaningful opportunity to be heard on her fear-based claim before an Immigration Judge in compliance with due process. (Id. at 31.) Finally, Petitioner seeks an award of attorneys' fees and costs under the Equal Access to Justice Act ("EAJA"). (Id.)

## IV.

## LEGAL STANDARD FOR IMMIGRATION DETENTION

The Immigration and Nationality Act ("INA") establishes the procedures governing detention, release, and removal of noncitizens ordered removed from the United States. The statute at issue here, 8 U.S.C. § 1231(a), applies to detention following the entry of final order of removal, including individuals in withholding-only proceedings. See Johnson v. Guzman Chavez, 594 U. S. 523, 533 (2021); Avilez v. Garland, 69 F.4th 525, 530 (9th Cir. 2023).

Under 8 U.S.C. § 1231(a)(1)(A), an alien who has been ordered removed must be detained during the 90-day removal period. 8 U.S.C. § 1231(a)(1)(A); see also Johnson v. Arteaga-Martinez, 596 U.S. 573, 578 (2022). Detention during the removal period is mandatory. See 8 U.S.C. § 1231(a)(2). After the 90-day removal period, "the Government 'may' continue to detain an alien who still remains here or release that alien under supervision." Zadvydas, 533 U.S. at 683 (quoting 8 U.S.C. § 1231(a)(6)). However, Section 1231(a)(6) includes an implicit limit on "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." Id. at 689. "[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." Id. at 699. Recognizing constitutional concerns raised by such prolonged detention, the Supreme Court observed "Congress previously doubted the constitutionality of detention for more than six months," and, therefore, "for the sake of uniform administration in the federal courts," established a presumptively reasonable six-

6

month period for post-removal-order detention.  Id. at 701.  This six-month period is a presumption, not a guarantee of release, and detention may continue so long as removal remains reasonably foreseeable.  Id.

After the six-month period, the burden is on the alien to show that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."  Id.; see also 8 C.F.R. § 241.13 (setting out procedures to determine whether there is a significant likelihood of removal pursuant to Zadvydas).  If the alien meets this burden, then the Government must "introduce evidence to refute that assertion" or release the alien.  Id.  However, the alien still "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."  Id.  Importantly, "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink."  Id.

## V.

## DISCUSSION

Under 8 U.S.C. § 1231(a)(6), an alien subject to a final order of removal may be detained beyond the 90-day removal period only for a period reasonably necessary to effectuate removal.  See Zadvydas, 533 U.S. at 689.  Here, it is undisputed that Petitioner was ordered removed to Honduras back in 2019.  (Dkt. 1 at 11.)  Therefore, the 90-day removal period expired years ago and the question is whether Petitioner's removal is reasonably foreseeable.  See Zadvydas, 533 U.S. at 701.  Under Zadvydas, the detainee bears the initial burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future."  Id.  If the detainee makes such a showing, the burden shifts to the Government to produce evidence sufficient to rebut that showing.  Id.

Here, the Court easily concludes that Petitioner has met her burden to show

that there is no significant likelihood of removal in the reasonably foreseeable future.  Indeed, it is undisputed that immigration authorities attempted to remove Petitioner to Honduras approximately 11 times before releasing her on an OSUP on August 13, 2020.  (Dkt. 1 at 11.)  It is further undisputed that Respondents have never been able to obtain travel documents for Petitioner to be removed to Honduras despite extensive efforts by Petitioner.  (Id. at 10-12.)  It is further undisputed that Respondents attempted to remove Petitioner to Honduras several more times since her re-detention on January 29, 2026, but that Petitioner was refused entry by Honduras.  (Id. at 12.)  Many courts have found that removal was not reasonably foreseeable where the Government had been unable to obtain travel documents.  See, e.g., Paris v. Bondi, 2026 WL 127807, at *4 (C.D. Cal. Jan. 13, 2026) ("The government also fails to point to any changed circumstances that would indicate that Romania is any more likely to issue those travel documents since its refusal nearly twenty years ago in 2006 due to Plaintiff's statelessness."); Martinez v. Noem, 2026 WL 559778, at *3 (S.D. Cal. Feb. 27, 2026) ("Respondents failed to secure travel documents, or alleged potential for travel documents, for Petitioner *before* his re-detention."); Valdez-Batista v. Immigr. & Customs Enf't Field Off. Dir., 2026 WL 449531, at *3 (W.D. Wash. Jan. 30, 2026) (relying in part on the Government's failure to deport petitioner for 13 years and the fact that the Government had not been able to secure travel documents as providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future" (internal quotation marks omitted)), report and recommendation adopted, 2026 WL 447344 (W.D. Wash. Feb. 17, 2026).

Thus, Petitioner has shifted the burden to Respondents to produce evidence to rebut her showing.  See Zadvydas, 533 U.S. at 701.  However, "Respondents are not presenting an opposition argument at this time." (Dkt. 8 at 2.)  Therefore, the Court concludes that Respondents have failed to rebut Petitioner's showing and the Court must conclude that Petitioner's removal to Honduras is not reasonably foreseeable

8

under Zavydas. See Zadvydas, 533 U.S. at 701. Accordingly, Petitioner's detention under 8 U.S.C. § 1231(a)(6) is no longer authorized and Petitioner is entitled to release. See id. at 699 ("[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute.").

The Court further concludes that Petitioner is entitled to notice and an opportunity to respond that comports with 8 C.F.R. § 241.13(i) should Respondents attempt to re-detain Petitioner in the future. See, e.g., Valdez-Batista, 2026 WL 449531, at *4 ("[I]n the event they seek to re-detain Petitioner in the future, Respondents must provide notice and an opportunity to respond that comports with 8 C.F.R. § 241.13(i)."). Indeed, the re-detention of a noncitizen subject to a final order of removal is governed by 8 C.F.R. § 241.13. The regulation was "intended to provide due process protections to noncitizens following the removal period as they are considered for continued detention, release, and then possible revocation of release." Constantinovici v. Bondi, 806 F. Supp. 3d 1155, 1163 (S.D. Cal. 2025) (internal quotation marks, brackets, and ellipses omitted). The regulation states, in part, that "[t]he Service may revoke [a noncitizen's] release under this section and return the [noncitizen] to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13. The regulation also provides that, "[u]pon revocation [of an OSUP], the [noncitizen] will be notified of the reasons for revocation of his or her release," and that there will be "an initial informal interview promptly after his or her return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3).

The Court further concludes that Petitioner is entitled to written notice and a meaningful opportunity to respond in reopened removal proceedings under 8 U.S.C. § 1231(b)(3) before any attempted third-country removal. See, e.g., Valdez-Batista, 2026 WL 449531, at *5 ("Accordingly, should Respondents take steps to remove

9

Petitioner to a country other than Cuba, they must provide Petitioner with written notice of their intent to do so and a meaningful opportunity to respond in reopened removal proceedings before an immigration judge under 8 U.S.C. § 1231(b)(3).").  Where the Government cannot remove a noncitizen to the country specified in their removal order, it may attempt to remove that person to a third country, but it must comply with both the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b), and the Due Process Clause.  See Aden v. Nielsen, 409 F. Supp. 3d 998, 1019 (W.D. Wash. 2019); Kumar v. Wamsley, 2025 WL 3204724, at *2 (W.D. Wash. Nov. 17, 2025) ("[T]he Government must follow the same multi-tiered process for selecting a country of removal that applied in the removal proceedings.").  To comply with due process, the Government must provide sufficient notice and a meaningful opportunity for the noncitizen to present any claim of fear of persecution or harm upon removal to a designated third country.  See Aden, 409 F. Supp. 3d at 1019.  Moreover, the INA prohibits ICE from removing a noncitizen to any country where their "life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  The Government must "make a determination regarding a noncitizen's claim of fear before deporting him."  Aden, 409 F. Supp. 3d at 1010; 8 U.S.C. § 1231(b)(3)(A).

Many courts have held that if a noncitizen claims fear of removal to a designated third country, the Government must allow them to pursue withholding of removal through reopened removal proceedings before an immigration judge.  See, e.g., Nguyen v. Scott, 796 F. Supp. 3d 703, 727 (W.D. Wash. 2025) ("Both the due process clause and the governing statute place the burden on the government— regardless of whether the country of deportation is designated during or after the removal hearing—to provide a meaningful opportunity to be heard on asylum and withholding claims. This cannot be satisfied by simply allowing the noncitizen to file a motion to reopen their removal proceedings; rather, the removal proceedings

must be reopened so that a hearing can be held." (internal quotation marks, brackets, and citation omitted)); accord A.A.M. v. Andrews, 815 F. Supp. 3d 1124, 1141 (E.D. Cal. 2025); Gomez v. Mattos, 2025 WL 3101994, at *6 (D. Nev. Nov. 6, 2025); M.T.M. v. Andrews, 2025 WL 4058220, at *9 (C.D. Cal. Sept. 11, 2025).

A permanent injunction may be entered, at the discretion of the Court, where the movant shows "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, (2006). The Court finds that Petitioner has made such a showing here. Petitioner has suffered an irreparable injury by being detained in violation of her due process rights for approximately six months, and would suffer irreparable injury again if Respondents repeat such conduct. Legal remedies such as damages would be inadequate to cure the unconstitutional deprivation of liberty. And the balance of hardships and public interest in merely requiring Respondents to provide basic due process in the event they seek to re-detain Petitioner and/or remove her to a third country, versus forcing Petitioner again to suffer detention and file a habeas petition to secure her release, favors the imposition of a limited injunction against future re-detention or removal to a third country.[1]

Thus, the Court concludes that Petitioner has made a sufficient showing under the eBay Inc. factors to justify a limited permanent injunction targeted at the specific harms presented in this case. See, e.g., Huy Cu v. Marin, 2026 WL 1427009, at *1-3 (C.D. Cal. May 21, 2026) (rejecting objections that prospective injunctive relief is

---

[1] Where the party opposing injunctive relief is the government, "the third and fourth factors—the balance of equities and the public interest—merge." Garcia v. County of Alameda, 150 F.4th 1224, 1234 (9th Cir. 2025) (internal quotations omitted).

inappropriate in the context of an immigration habeas petition); Araujo-Contreras v. Janecka, 2026 WL 1625368, at *1-4 (C.D. Cal. June 3, 2026) (rejecting objections to permanent injunctive relief requiring a pre-deprivation hearing before re-detention in the context of an immigration habeas petition finding a violation of the petitioner's procedural due process rights).

Finally, the Court notes that Petitioner also requested an award of reasonable attorney's fees and costs under the EAJA. (Dkt. 1 at 31.) The Court will consider an application under the EAJA that is filed within 30 days of entry of final judgment in this action. See Rahimi v. Semaia, 2026 WL 246066, at *3 (C.D. Cal. Jan. 27, 2026) ("The Court will consider an application requesting costs and reasonable attorney's fees under the EAJA that is filed within 30 days of final judgment in this action.").

\\

\\

\\

## VI.

## CONCLUSION

Based on the foregoing, the Court GRANTS the Petition as follows. Respondents shall immediately release Petitioner Marvella Soad Quiroz-Lara (A# 213-530-970) ("Petitioner") from custody on her prior conditions of release (only those conditions in place prior to Petitioner's January 29, 2026 re-detention). Respondents shall also immediately return any confiscated property and documents to Petitioner upon release. Respondents shall not re-detain Petitioner pursuant to 8 U.S.C. § 1231 without first providing notice and an opportunity to respond that

comports with 8 C.F.R. § 241.13(i).  Respondents shall not attempt to remove Petitioner to any country other than Honduras without first providing written notice of their intent to do so and a meaningful opportunity to respond in reopened removal proceedings under 8 U.S.C. § 1231(b)(3).  Respondents shall file a notice of compliance within **three days of entry of Judgment.**

IT IS SO ORDERED.

DATED:   July 27, 2026

_____
HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE